Merrimack
No. 84-308

ROBERT BRENNAN

v.

MICHAEL J. CUNNINGHAM,
WARDEN OF THE NEW HAMPSHIRE STATE PRISON

May 28, 1985

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the plaintiff.

*Stephen E. Merrill*, attorney general (*Ronald F. Rodgers*, assistant attorney general, on the brief and orally), for the defendant.

DOUGLAS, J. This is an appeal from an order of the Superior

Court (*Cann*, J.) dismissing the plaintiff's petition for a writ of habeas corpus for failure to state a cause of action. We affirm.

On September 21, 1966, the petitioner, Robert Brennan, pleaded guilty to second-degree murder in the bludgeoning death of a six-year-old boy. Brennan was sentenced to life imprisonment. Under the parole statute in effect at that time, RSA 651:45(a) (recodified at RSA 651-A:7 (Supp. 1983)), the life sentence automatically carried with it a minimum of eighteen years minus any good time credits. As to Brennan, this meant that he first became eligible for parole in 1976.

On September 9, 1976, the parole board (board) denied Brennan's request for parole. Brennan reapplied for parole on October 27, 1977, and again was denied.

In November 1977, Brennan filed a *pro se* petition for a writ of mandamus. Although the petition was denied, the Court (*Johnson*, J.) expressed concern that the board would continue to cite the nature of the crime as a reason, possibly forever, for denying parole. The court also expressed concern that Brennan would never have an opportunity to demonstrate his employability. Robert Johnson, an officer of the board, responded to these concerns by assuring the court that it was not the board's policy to keep a life term prisoner in prison forever. Johnson also told the court that the board would request work release in writing to the prison officials.

Although he was encouraged by this hearing, Brennan was concerned that the board would not favorably consider his release because of its concern that he was sexually disturbed. As a result, Brennan, with the assistance of Everett Perrin, the prison warden, voluntarily entered the New Hampshire Hospital for treatment of acknowledged sexual abnormality. This treatment was part of a long-range pre-parole plan involving transfer to the minimum security unit (M.S.U.) and eventual work release. Brennan was a patient at New Hampshire Hospital for a year of intensive therapy. He completed the therapy in September 1980, at which time the hospital staff recommended his transfer to the M.S.U.

The classification board and prison board of trustees, however, refused to transfer Brennan to the M.S.U. At the same time, the parole board would not consider Brennan for parole until he had completed the socialization programs available only at the M.S.U.

To circumvent this impasse, Brennan filed a petition in superior court asking to be readmitted to the hospital for the purpose of engaging in socializing programs. He alleged that the denial of access to these programs was based on "improper political motives." Finally, after additional efforts by Warden Perrin, the board of trustees approved Brennan's transfer to the M.S.U. He remained

there without incident until July 1982. During that month the petitioner engaged in a homosexual act with another M.S.U. inmate. He was briefly returned to the general prison population and lost some good time credits. However, he was later returned to the M.S.U.

In May 1983, Brennan sought admission to the work release program at a halfway house, the Manchester Community Correction Center. To be eligible for this program, a prisoner must satisfy the M.S.U. requirements and be within eight months of his parole eligibility date. Petitioner was told by the administrators of the correction center that he could not be transferred to the halfway house unless they were assured that petitioner would in fact be granted parole upon successful completion of the six-to-eight-month program. The parole board's position was that Brennan would not be considered for parole until and unless Brennan had established parole readiness through a work re-entry program at the halfway house.

Faced with this predicament, Brennan sought assistance from the warden. Warden Perrin obtained "assurances" from the chairman of the board of parole "that if [Brennan] completed a work release program the Board would look favorably on [Brennan's] parole application in April, 1984." On October 28, 1983, Brennan was transferred to the Manchester halfway house. He was given an "inmate permit to be at large" and advised that his conduct was governed by the "Handbook of Rules and Regulations of the Community Correctional Center." The "inmate permit" authorized Brennan "under RSA 651:25 to be at large within the boundaries of the State of New Hampshire."

While at the Manchester Community Correction Center, Brennan gained full-time employment at the Granite State Packing Company. His employment and life in the halfway house passed without incident for three-and-a-half months. In mid-January 1984, however, a series of newspaper articles appeared in the Foster's Daily Democrat and the Manchester Union Leader. The articles called attention to a petition by the victim's relatives which was directed at the governor. The petition strongly opposed Brennan's release on parole.

On January 30, 1984, the manager of the Manchester halfway house was told by a prison official that Brennan was to be immediately returned to prison. An unsigned typewritten note on blank paper was read to Brennan. It stated that due to the "present community reaction to your potential parole, the Department of Corrections feels that it is less likely you would receive a favorable decision. For your safety and for what the public perceived to be their safety, we have decided to transfer you back to the N.H. State Prison . . . ."

Previously, in December 1983, the prison administration had been restructured under RSA chapter 21-H (Supp. 1983). A new warden, the present defendant, Michael J. Cunningham, was appointed. It was pursuant to the warden's authority under RSA 651:25, IV (Supp. 1983) that the petitioner was transferred from the halfway house back to the prison.

On February 1, 1984, petitioner's counsel asked Warden Cunningham for a full written explanation for the transfer. She further advised the warden that she wished to represent Brennan at the forthcoming classification hearing. The warden responded that the matter would not be discussed and that counsel could only be a silent observer at the hearing.

Without notice to counsel, a hearing was held on February 3 before Warden Cunningham. Brennan was advised that he could have counsel present as a silent observer but was not told that his counsel requested to be present at the hearing. Brennan declined the offer of silent counsel. At the hearing, the only evidence presented was petitioner's classification file. The only witness called was a prison official.

On February 17, 1984, Warden Cunningham sent petitioner a letter. The letter explained that: "Your recall to the N.H. State Prison was based on my judgment that the peace, safety, welfare or security of the community may be endangered were you to remain on work release status . . . . Based on the foregoing factors, particularly the heinous nature of your crime, the relatively short period of time during which you have been incarcerated and the necessarily low level of supervision afforded work release inmates at the Halfway House, I have decided to discontinue your participation in the work release program for the indefinite future . . . . "

On April 8, 1984, the plaintiff filed the petition involved in this case for a writ of habeas corpus seeking as relief an order requiring the warden to place the plaintiff in the halfway house and work release programs. The court denied that petition on April 25, 1984, for failure to state a cause of action. The plaintiff filed both a motion to amend the petition and a motion to reconsider the amended petition on May 15, 1984. The court granted both motions and dismissed the amended petition in its order dated May 29, 1984.

The court dismissed the writ for failure to state a cause of action. Although unarticulated, the basis for the dismissal was apparently a finding that the petitioner's continued participation in the work release program was not a liberty interest entitled to due process protection.

 "The procedural prerequisite for a court's consideration of

a petition for a writ of habeas corpus is an allegation of a present deprivation of a protected liberty interest." *Woodman v. Perrin*, 124 N.H. 545, 548, 474 A.2d 999, 1001 (1984). The petitioner claims that his participation in the work release program is a liberty interest grounded in the State Constitution. N.H. CONST. pt. I, arts. 2, 12. We disagree.

The United States Supreme Court has held that the nature of *parole* is such that its *revocation* triggers the protection of the due process clause of the fourteenth amendment. *Morrissey v. Brewer*, 408 U.S. 471 (1972). Although noting that "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of . . . conditional liberty," the court nonetheless recognized that parole enables the parolee "to do a wide range of things open to persons who have never been convicted of any crime" such as being gainfully employed, associating freely with family and friends and forming other enduring attachments of normal life. *Id.* at 480, 482.

■■ This court has analogously held that termination of freedom by revocation of a suspended sentence involves constitutional liberty interests. *Stapleford v. Perrin*, 122 N.H. 1083, 453 A.2d 1304 (1982). We have also recognized that in other situations where "the defendant has been afforded liberty," such as parole or probation, such liberty is "significant" and "may not be revoked without due process." *Id.* at 1088, 453 A.2d at 1307.

It is the qualitatively different nature of the limited freedom inherent in work release which distinguishes this situation from any freedoms allowed in the parole or suspended sentence contexts. A prisoner in a halfway house continues to live on prison property, under supervision, and must report his whereabouts at all times. Transfer to and from a halfway house is thus more analogous to transfer between prisons, which does not involve a protected liberty interest, *Goodnow v. Perrin*, 120 N.H. 669, 421 A.2d 1008 (1980); *Olim v. Wakinekona*, 461 U.S. 238 (1983), than to revocation of parole or suspended sentence. The warden should have the discretion to move a prisoner from one unit to another, from medium to maximum security, to a halfway house, from work release and so on. It is when paroled or free as on a suspended sentence that the *Stapleford* protections apply and a liberty interest protected by our State Constitution attaches.

RSA 651:25, IV (Supp. 1983) provides that: "The warden . . . may at anytime recall a prisoner . . . if he believes or has reason to believe the peace, safety, welfare, or security of the community may be endangered by the prisoner being under such release status."

Regulations promulgated pursuant to this statute, which are contained in the Community Correction Center—Handbook of Rules and Regulations, clarify what conduct justifies revocation. This conduct includes, but is not limited to, use of alcohol or drugs, threat or use of violence and failure to return to the center at specified times. A prisoner may also be returned if he displays conduct which has a "negative effect on the Center's existence" or an "inability to adjust to the program." On the basis of the statute and the regulations promulgated pursuant thereto, it is evident that the warden has the authority to monitor a prisoner's behavior and has wide discretion to revoke work release.

We find no error in dismissing the writ because there is no liberty interest implicated by the halfway house transfer.

*Affirmed.*

All concurred.