Robert BRENNAN, Plaintiff, Appellee,

v.

Michael J. CUNNINGHAM, etc.,
Defendant, Appellant.

No. 86–1877.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1986.
Decided March 3, 1987.

James E. Duggan, Concord, N.H., by Appointment of the Court, for plaintiff, appellee.

Before COFFIN, Circuit Judge, TIMBERS,[*] Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Michael J. Cunningham, warden of the New Hampshire State Prison, appeals from summary judgment on a habeas corpus petition in United States District Court for the District of New Hampshire. The court reinstated the appellee, prisoner Robert Brennan, in a work release program at the Manchester Community Correction Center (the halfway house). Brennan had been removed from the program and transferred back to prison under circumstances which the district court viewed as a violation of due process.

## I. BACKGROUND

In 1966, Brennan pleaded guilty to second degree murder in the brutal killing of a six-year old boy.[1] He was sentenced to life imprisonment and first became eligible for parole in 1976. His applications for parole were denied in 1976 and 1977. In May, 1983, Brennan sought admission to the work release program at the halfway house.

Brennan was able to enter the program only with the assistance of then Warden Perrin. The halfway house considers inmates for admission when they are within eight months of parole. The parole board, however, had refused to consider Brennan for parole until he had demonstrated his readiness for parole through participation in a work release program. Warden Perrin, therefore, obtained "assurances" from the chairman of the board of parole "that if [Brennan] completed a work release program the Board would look favorably on

---

Ronald F. Rodgers, Sr. Asst. Atty. Gen., with whom Stephen E. Merrill, Atty. Gen., Concord, N.H., was on brief for defendant, appellant.

[*] Of the Second Circuit, sitting by designation.

**1.** We draw the facts in this case primarily from the district court opinion and from the prior decision of the New Hampshire Supreme Court in *Brennan v. Cunningham*, 126 N.H. 600, 493 A.2d 1213 (N.H. 1985).

[Brennan's] parole application in April, 1984."

*Brennan v. Cunningham,* 126 N.H. 600, 493 A.2d 1213, 1214 (1985). On the basis of these "assurances," Brennan was transferred to the Manchester halfway house on October 28, 1983.

In December, 1983, the prison administration was restructured. A new Commissioner of Corrections, Ronald Powell, and a new warden, appellant Michael Cunningham, were appointed. *See* N.H.Rev.Stat. Ann. ch. 21–H (Supp.1986).

From the end of October, 1983, to mid-January, 1984, Brennan's life at the halfway house and his employment at the Granite State Packing Company passed without incident. In mid-January, however, a series of newspaper articles appeared that called attention to a petition to the governor by the victim's family. The petition opposed Brennan's work release status and impending parole. On January 30, 1984, an unsigned, typewritten note [2] was read to Brennan that stated:

> You (Robert Brennan) were transferred to the Manchester Community Correction Center with the expectation that you would receive a favorable parole hearing. However, with present community reaction to your potential parole, the Department of Corrections feels that it is less likely that you would receive a favorable decision. For your safety and for what the public perceives to be their safety, we have decided to transfer you back to the New Hampshire State Prison.

Brennan was returned to prison the same day.

On February 1, 1984, Brennan's counsel wrote to Warden Cunningham asking for a written explanation of the transfer and seeking to represent Brennan at any hearing. On February 3, a hearing was held, attended by Brennan, Warden Cunningham, and Peter McDonald, Director of Treatment and Programs. Brennan declined to request the presence of counsel after being advised that counsel would only

be allowed to attend as a silent observer. Brennan was allowed to make statements in his own behalf and was not denied the opportunity to present evidence. The only evidence actually presented was Brennan's case file and statements by Brennan and McDonald.

On February 17, 1984, Brennan received a letter from the warden which stated in pertinent part:

> You were removed from work release status at the Manchester Community Correction Center on Monday, January 30, 1984, pursuant to RSA 651:25, IV. Your recall to the New Hampshire State Prison was based on my judgment that the peace, safety, welfare, or security of the community may be endangered were you to remain on work release status.
>
> . . . .
>
> Based on the foregoing factors, particularly the heinous nature of your crime, the relatively short period of time during which you have been incarcerated and the necessarily low level of supervision afforded work release inmates at the Halfway House, I have decided to discontinue your participation in the work release program for the indefinite future. Your participation in that program will be considered once again if and when the Adult Parole Board assigns you a definite parole date.

In September, 1984, the Parole Board voted to deny Brennan parole, stating that "[r]elease at this time would depreciate the seriousness of his crime."

In April, 1984, Brennan initiated habeas corpus proceedings in state court. The initial petition requested that

> Petitioner be allowed forthwith to resume and complete his work release at the Manchester Community Correction Center, and upon his successful completion thereof to receive a parole hearing no less favorable than the hearing expected by Petitioner and the Respondents when Petitioner's work release was terminated.

---

**2.** Warden Cunningham later stated in an affidavit that the note was prepared by the office of the Commissioner of Corrections.

Brennan pursued this petition in state court until its rejection by the New Hampshire Supreme Court in May, 1985. *See Brennan v. Cunningham,* 126 N.H. 600, 493 A.2d 1213 (N.H.1985).

The United States District Court for the District of New Hampshire granted Brennan's petition on motions for summary judgment. In an April, 1986, order, the court found that, based on existing state regulations, revocation of work release implicated a liberty interest for due process purposes. In an August, 1986, order, the court held that Brennan was entitled to the kind of due process hearing described in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The court found that the written statement issued by the warden after the hearing was defective because it was not based on the "modicum of evidence" required by the Court in *Superintendent, Massachusetts Correctional Institution, Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (*Hill*), for hearings under *Wolff.* The court ordered that Brennan be reinstated in the halfway house and that a parole board hearing be held upon Brennan's completion of the halfway house program.

## II. REINSTATEMENT IN THE HALFWAY HOUSE AS A HABEAS CORPUS ACTION

Appellant raises the threshold issue of the appropriateness of maintaining this action under the federal habeas corpus statute, 28 U.S.C. § 2254 (1982). He argues that the claim for reinstatement challenges the conditions of confinement and not the fact or length of confinement. Citing *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), appellant contends that the proper vehicle for such a challenge is the civil rights statute, 42 U.S.C. § 1983 (1982).

▮ We reject this contention. We do not agree that *Preiser* would mandate that the reinstatement claim be brought as a § 1983 action even if we were to accept appellant's characterization of the claim as a challenge to the conditions of confinement. In *Preiser,* 411 U.S. at 499–500, 93 S.Ct. at 1841, the Court explicitly left open the possibility that a challenge to prison conditions, cognizable under § 1983, might also be brought as a habeas corpus claim.[3] *See also Bell v. Wolfish,* 441 U.S. 520, 526–27 n. 6, 99 S.Ct. 1861, 1867–68 n. 6, 60 L.Ed.2d 447 (1979); *Dickerson v. Walsh,* 750 F.2d 150, 153–54 (1st Cir.1984).

We find, moreover, that this case may be properly viewed as similar to cases involving challenges to the fact or length of confinement. The work release program in New Hampshire is closely connected to a prisoner's impending release. The program considers for admission only those inmates who are within eight months of parole. The program's "Mission Statement," printed in the "Community Centers—Handbook of Rules and Regulations" (Handbook), states that the "Centers function as testing situations to enable inmates to demonstrate they are capable of leading responsible law-abiding lifestyles." *See* Handbook, Rule C. Moreover, the Handbook states that admission into this "testing situation" for release is granted only after a lengthy application process involving consideration by a classification board, and approval by the warden and the sentencing judge. *See id.* at Rule D, "Application and Screening Process." Presumably, this evaluation process is undertaken in light of the "mission" of the program.

Finally, the actual operation of the work release program shows that it indeed warrants our viewing it as a "halfway house" between incarceration and release. The Handbook states that "[t]he program allows for the resident to progress through four phases of increasing freedom and responsibility." *See* Handbook at 13. The four phases culminate in such freedoms as

---

**3.** As support for this proposition, which it characterized as "arguable," the Court cited Note, Developments in the Law—Habeas Corpus, 83 Harv.L.Rev. 1038 (1970). That Note argued that "the lawfulness of a custody depends, not merely upon the legal basis for *some* kind of custody, but upon the lawfulness of the specific type and manner of confinement in question." 83 Harv. L.Rev. at 1085.

"unsupervised outings of up to 12 hours." *Id.* at 14.

The present case provides a telling example of the intimate connection between the halfway house program and ultimate parole. Brennan's admission to the program was the culmination of a "long-range pre-parole plan" lasting several years. *See Brennan v. Cunningham,* 493 A.2d at 1214. This plan included a year of intensive therapy at the New Hampshire Hospital for "sexual abnormality," as well as participation in "socializing programs" in the prison's minimum security unit. *Id.* Finally, Brennan was admitted to the halfway house only after the "assurances" from the Parole Board were obtained by Warden Perrin that the board would "look favorably" on Brennan's parole application in April, 1984. Thus, the nature of the program, as exemplified by Brennan's case, shows that it is more closely related to the length, rather than simply the conditions, of confinement.

We hold, therefore, that, under *Preiser v. Rodriguez,* a challenge to the revocation of participation in such a program may be brought in a habeas corpus proceeding.[4]

### III. LIBERTY INTEREST

The central issue in this case is whether Brennan had a liberty interest, implicating due process protections, in remaining at the halfway house. The first matter to be resolved is whether we are to look for such an interest in the fourteenth amendment itself or in the various sources of state law.

When a prisoner is still under confinement, the Supreme Court has consistently held that

"[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."

*Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)). Thus, for prisoners under confinement, the Court has generally failed to find a liberty interest deriving independently from the Constitution. An independent liberty interest was not found for prisoners under confinement even in cases concerning parole and good time credits. *See Hewitt,* 459 U.S. at 467–68, 103 S.Ct. at 869 (citing *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979) and *Wolff v. McDonnell,* 418 U.S. at 557, 94 S.Ct. at 2975).

On the other hand, the Court has found independent constitutional liberty interests where total release from institutional life has been revoked, as in the case of a parolee, or where the restrictions imposed go beyond the original conditions of confinement. *See Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (independent constitutional due process protection in case of *revocation* of parole); *Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1262–64, 63 L.Ed.2d 552 (1980) (independent due process protection in involuntary transfer to mental hospital).

An inmate in a halfway house is granted a measure of liberty that lies between that of a parolee and that of an inmate incarcerated in prison. While the prisoner in this situation enjoys some significant liberty, he remains under confinement in a correctional institution. His position is, therefore, not like that of a parolee. *See, e.g., Whitehorn v. Harrelson,* 758 F.2d 1416 (11th

---

4. Some suits involving challenges to work release programs have been brought as § 1983 actions. It is not clear from a reading of those cases, however, whether the programs were as closely connected to ultimate release as the New Hampshire program. In any case, the issue of whether habeas proceedings would have been more appropriate was not discussed in any of those cases. *See, e.g., Lewis v. Thigpen,* 767 F.2d 252 (5th Cir.1985); *Whitehorn v. Harrelson,* 758

F.2d 1416 (11th Cir.1985); *Garcia v. DeBatista,* 642 F.2d 11 (1st Cir.1981). In a case involving a work release program described in terms quite similar to the New Hampshire program, a court dismissed the portion of a § 1983 suit claiming injunctive and declaratory relief mandating admission into the program. The court held that habeas proceedings were the exclusive remedy under *Preiser. See Winsett v. McGinnes,* 425 F.Supp. 609 (D.Del.1976).

Cir.1985) (no independent constitutional liberty interest in remaining in work release program); *Garcia v. DeBatista*, 642 F.2d 11 (1st Cir.1981). If a liberty interest exists in this case, therefore, it must derive from state statutes, regulations, or practices. *See, e.g., Vitek v. Jones*, 445 U.S. 480, 488–91, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980); *Durso v. Rowe*, 579 F.2d 1365, 1371 (7th Cir.1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979).

To establish a liberty interest deriving from state law, a prisoner must show "that particularized standards or criteria guide the State's decisionmakers." [Cite omitted.] If the decisionmaker is "not required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," ... the State has not created a constitutionally protected liberty interest.

*Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (cites omitted).

The state statute concerning transfer from a work release program to a prison is N.H. Rev.Stat.Ann. § 651:25 (Supp.1983). The statute states in pertinent part:

The warden of the state prison may at any time recall a prisoner from such release status if he believes or has reason to believe the peace, safety, welfare, or security of the community may be endangered by the prisoner being under such release status.

Section 651:25, standing alone, thus appears to grant the warden of the state prison broad discretion to return inmates to custody. If the statute were the only source of a liberty interest deriving from a limitation on official discretion, we would be faced with the extremely difficult question of whether the wording of the statute was closer to that discussed by the Court in *Hewitt*, 459 U.S. at 470–71 n. 6, 103 S.Ct. at 871 n. 6, or in *Olim*, 461 U.S. at 242–43, 103 S.Ct. at 1743–44. In the present case, however, there are other possible sources of a liberty interest. We turn, therefore, to those other sources, the regulations im-plementing the statute and any evidence of state practice.

The "Community Correction Centers— Handbook of Rules and Regulations" (Handbook) codifies prison regulations promulgated pursuant to § 651:25. *See* Handbook, Rule B, "Authority." These regulations, which "outline and explain how the Community Centers operate," were "written for applicants, residents and staff." *Id.* at Rule A. The Handbook's readers are advised that "[i]nstructions which are directive in nature constitute standing orders and violations are punishable." *Id.*

Rule I:6 of the Handbook, entitled "Return to Custody," provides in pertinent part:

Placement at the Community Correction Centers is a privilege of the New Hampshire State Prison system and residents who do not abide by the Center rules and regulations may be returned to the Prison. More specifically, violations of the following rules will result in immediate return to custody:

a. Introduction of any drug or alcohol onto the premises of the Community Corrections Center;

b. Use of alcohol or drugs while at the Center, at work or on any type of release or outing from the Center;

c. The threat or use of violence;

d. Failure to return to the Center within established time frames or leaving the Center without permission;

e. Conduct that is determined to have a negative effect on the Center's existence or the residents' programs;

f. Inability to adjust to the program. A resident who is returned to custody will be normally placed initially in Administrative Segregation pending investigation. Reports will be provided concerning the situation and the resident may face disciplinary action and/or Court proceedings.

As can be seen by a reading of the rule, return to custody is stated to be warranted as a result of a violation of any of the Center's regulations, and particularly as a result of a set of enumerated infractions.

Moreover, the list of enumerated fractions appears to aim at comprehensiveness by including such categories as "inability to adjust to the program" and "conduct that is determined to have a negative effect." The common thread linking the various categories is a stress on certain kinds of inappropriate inmate conduct. We think it is reasonable to find that Rule I:6 contains an inclusive scheme for governing the return to custody of participants in the program.

An inmate's expectations concerning this rule derive both from the language of the rule itself as well as the general clause in Rule A concerning the binding nature of the regulations. Moreover, an inmate's expectations may also be reasonably said to stem from an "Inmate Permit to be at Large," signed by program participants. The permit states in its second and third paragraphs:

2. Inmate, after having read *"Handbook of Rules and Regulations of the Community Corrections Center"* or had them explained to him, agrees to obey these rules and regulations and any others placed on him by the program director. Inmate will also obey all the laws of the State of New Hampshire. 3. *Inmate agrees that violations of rules and regulations cannot be tolerated and they can result in his being removed from the program.* If inmate is removed, his case will be presented to the next scheduled Parole Board for further consideration. [Emphasis added.]

Appellee Brennan signed such an Inmate Permit.

■ We find that the provisions of Rule I:6 constitute " 'particularized standards or criteria guiding the State's decisionmakers.' " *See Olim,* 461 U.S. at 249, 103 S.Ct. at 1747. The prisoners subject to the rule, therefore, have a legitimate expectation that they will be returned to custody only for violating the Center's rules, particularly the enumerated infractions. We base this finding on the fact that the rule is part of the regulations implementing the statute establishing the program. The regulations explicitly state that they are *binding* on inmates as well as purporting to describe

how the program operates in *practice. See* Handbook at Rule A. The Inmate Permit to be at Large, paras. 2 and 3, is further evidence of the practice of giving prisoners the expectation that their conduct will be regulated by the Handbook and that their return to custody will result only from a violation of its rules.

In so holding, we have undertaken the kind of case-by-case analysis of state law required by the Court in *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106. We recognize that this case presents some features which are unlike those of some other work release cases. First, we note that unlike the regulations in some other cases, the Handbook here does not expressly provide for hearings in the event of a return to custody. *Cf., e.g., Parenti v. Ponti,* 727 F.2d 21 (1st Cir.1984). It does, to be sure, provide for an "investigation" and for "reports." The Court, however, has stated that the precise procedural structure set up by state regulations is not dispositive of the existence of a legitimate liberty interest. Rather, courts must examine the substantive nature of the guidelines for objective constraints on state decisionmakers. *See Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871.

Second, there has been some disagreement among the circuits as to what the appropriate standard should be in evaluating state prison regulations. The controversy, sparked particularly by *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir.1980), *cert. denied, sub nom. Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), concerns the question of whether a specific kind of "mandatory language" is required in order to find that state regulations create a liberty interest. *See Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (White, J., dissenting from denial of certiorari). The Supreme Court cited "mandatory language" as an important factor in its finding of a liberty interest in *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871, without holding that such language was always necessary for such a finding. The somewhat later case of *Olim,* 461 U.S. 238, 103 S.Ct. at 1741, however, expressly formulated a standard. That

standard, cited fully, *supra,* at 6, explained the requirement for a finding of a liberty interest in terms of "substantive standards or criteria," *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747. The holding in *Olim* tells us to look at the nature of the constraints on decisionmakers without requiring a particular formula of "mandatory language."

It is unnecessary, however, for us to choose between the different ways in which the standard has been phrased. We have not primarily had recourse, like the court in *Winsett,* to broad statements of policy or purpose in finding constraints on state decisionmakers. To be sure, the list of violations in Rule I:6 does not literally exclude the possibility that a return to custody could occur for other reasons or for no reason at all. We have, however, examined the detailed provisions of Rule I:6, in the context of the function of the Handbook's regulations within the framework set up by the statute, and the further evidence of state practice provided by the "Inmate Permit." We conclude that there is a legitimate expectation on the part of inmates that they would be treated according to the regulation and would not simply be transferred back to prison on the basis of criteria to which no allusion may be found in the regulation.

Although we have stated our holding in terms of *Olim,* we draw further support for our interpretation of the regulations from *Scott v. Illinois Board of Parole and Pardon,* 669 F.2d 1185 (7th Cir.1982), *cert. denied,* 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982), a case decided before the adoption of the standard in *Olim.* The *Scott* court analyzed a statute stating that the parole board "shall not" grant parole in the presence of certain enumerated circumstances. It held that such language was sufficiently analogous to that discussed in *Greenholtz* where a statute stated that a parole board "shall" grant parole "unless" certain conditions exist. *See Scott* 669 F.2d at 1188. The *Scott* court so held despite its recognition that the negative formulation left greater room for a discretionary interpretation of the statute than the positive formulation in *Greenholtz.*

*See Scott* at 1188–89. This theoretical possibility of a discretionary interpretation of the statute is similar to the situation here with Rule I:6. The court in *Scott* rejected the discretionary interpretation both from a reading of the statute itself and from a reading of the statute in light of other state regulations.

Similarly, we hold here that the district court properly found that Rule I:6, read in context, provided Robert Brennan with a due process liberty interest in remaining at the Manchester halfway house.

## IV. WHAT PROCESS WAS DUE?

In determining the process due under the fourteenth amendment, we must consider whether the present case should be subject to the kind of process outlined in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (parole), *Hewitt v. Helms,* 459 U.S. at 472–73, 103 S.Ct. at 871–72 (administrative segregation), or *Wolff v. McDonnell,* 418 U.S. at 563–67, 94 S.Ct. at 2978–80 (good time credits). We agree with the district court that the *Wolff* process is the most appropriate given the interests involved here.

*Hewitt* was a case involving transfer from the general prison population to administrative segregation. The Court required only an "informal non-adversary review ... within a reasonable time" after the prisoner's confinement in administrative segregation. In explaining the reason for the minimal nature of the process due, the Court stated:

Under *Mathews v. Eldridge,* 424 U.S. 319, 335 [96 S.Ct. 893, 903, 47 L.Ed.2d 18] (1976), we consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment. Respondent's private interest is not one of great consequence. He was merely transferred from one extremely restricted environment to an even more confined situation. Unlike disciplinary confinement the stigma of wrongdoing or misconduct does

not attach to administrative segregation under Pennsylvania's prison regulations. Finally, there is no indication that administrative segregation will have any significant effect on parole opportunities.

*Hewitt*, 459 U.S. at 473, 103 S.Ct. at 872.

By contrast, in the present case, the prisoner was transferred from a situation involving significant liberty to incarceration in a prison. Moreover, under Rule I:6, such transfer normally occurs only after some wrongdoing or misconduct. Finally, the close relationship of the work release program to the possibility of parole further distinguishes this case from *Hewitt*.

■ Given the character of this case, we agree with the district court that the process due should be similar to that mandated in *Wolff*, a case involving the revocation of good time credits. In *Wolff*, the Court required more protection than it was to do in *Hewitt*. Yet it declined to give inmates whose good time credits had been revoked the full protections owed to individuals whose parole had been revoked. *Cf. Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484. In explaining the balance it had struck between the various interests, the Court noted that revocation of good time credits did not work the same "immediate disaster" as the revocation of parole and that it was not "certain" to change the actual date of parole. *Wolff* at 560–61, 94 S.Ct. at 2976–77.

The revocation of the inmate's participation in a work release program bears a quite similar, though not identical, relationship to his liberty interests as the revocation of good time credits. The program, like the good time credits in *Wolff*, is related to giving the prisoner an opportunity to establish his readiness for accelerated release from prison. Indeed, in some respects, the present case involves a greater liberty interest than did *Wolff*. Unlike the revocation of good time credits, the return to custody from the halfway house did "then and there work [a] change in the conditions of [the inmate's] liberty," *Wolff* at 561, 94 S.Ct. at 2977. The liberty interest here does not rise sufficiently above that involved in *Wolff* to require the protec-

tions required in *Morrissey;* the balance of interests qualifies it for the protections granted in *Wolff*.

As the district court stated, *Wolff* provides that three due process requirements be satisfied:

(1) advance written notice of the disciplinary charges, (2) an opportunity consistent with institutional safety to call witnesses and present evidence, and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.

*See Wolff*, 418 U.S. at 563–67, 94 S.Ct. at 2978–80.

■ We find that the requirement of advance notice was satisfied by the note, dated January 30, 1984, read to Brennan before his return to prison. This advance notice requirement was satisfied despite the fact that Brennan was transferred the same day the note was read to him and several days before the hearing was held. As the district court noted, "where a prisoner enjoys a conditional freedom beyond the walls of prison, ... advance notification of a pending transfer back to penal confines would significantly increase the risk of flight." The Supreme Court has repeatedly stated that " 'consideration of what procedures due process may require ... must begin with a determination of the precise nature of the government function involved.' " *Wolff*, 418 U.S. at 560, 94 S.Ct. at 2976 (quoting *Morrissey v. Brewer*, 408 U.S. at 481, 92 S.Ct. at 2600). The kind of notice given here is reasonable in light of the government's interest in not gratuitously giving prisoners an incentive to flee.

The second *Wolff* requirement, an opportunity to call witnesses and present evidence, was also satisfied. Brennan was denied neither opportunity and made several statements justifying his continuation at the halfway house. He declined the permission given him to have counsel present.

The final *Wolff* requirement is that of a written statement issued by the decisionmaker. This requirement must be viewed in light of the Court's interpretation of *Wolff* in *Hill*, 472 U.S. 445, 105 S.Ct. 2768,

86 L.Ed.2d 356 (1985). In *Hill*, the Court stated that a decision made after a hearing required under *Wolff* must be based on a "modicum of evidence." *Id.* 105 S.Ct. at 2774. The Court explained this requirement as deriving from the obligation under *Wolff* to provide a written explanation of the evidence relied upon in arriving at the decision.

The district court, in its August, 1986, order, found that the reasons given in the warden's written statement were either not permissible under the state regulations or were not supported by the evidence. Specifically, the court found that: (1) the likelihood of parole, the presence of a risk to the inmate, and the public's perception of a risk to their safety, were not listed reasons for transfer back to custody under either § 651:25 or Rule I:6; (2) nothing in the record of the hearing supported a reasonable belief on the part of the commissioner that Brennan represented a threat to the community under § 651:25; (3) Brennan had not violated any of the enumerated violations in Rule I:6; and (4) to the extent that the decision was based on factors concerning the nature of the crime and of the halfway house program, it could not be viewed as based on "some evidence" because such factors were well-known to the prison authorities at the time of Brennan's admission into the program.

■ The appellant warden objects to the district court's August order on two grounds. First, he claims it is inconsistent with the earlier April order. He argues that, in the second order, the district judge evaluated the warden's statement of his decision by the standards of § 651:25. In the earlier order, however, the judge had stated that § 651:25 was too discretionary to form the basis of a due process liberty interest.

The district court's second order does, in fact, evaluate the decision partly with reference to § 651:25 and partly with reference to Rule I:6, despite the fact that it held that § 651:25 does not, by itself, create a liberty interest. As we noted above, *supra* at 6, we have not based our finding of a liberty interest on the statute

alone, but have, instead, looked to the regulations and evidence of state practice. We do not think, however, that the district court's references to § 651:25 in its second order weaken its evaluation of the return to custody under Rule I:6. The Handbook basically contains regulations that implement in detail the broad policy formulations of the statute. The statute says that a prisoner may be returned to prison if the community is endangered. The regulations give concrete form to this broad statement by explaining in detail how to determine such a danger to the community. Rule I:6 determines such danger with reference to various kinds of inmate misconduct. We have already noted the comprehensiveness of the rule's categories. The finding of the district court is perhaps confusingly formulated since it refers to § 651:25's criterion of danger to the community independently of the statute's detailed implementation by Rule I:6. The court's holding that there was insufficient evidence to have based a return to custody on Rule I:6 remains, nevertheless, sound.

Second, the warden claims that the revocation procedure here was basically similar to that approved by the court in *Tracy v. Salamack*, 572 F.2d 393 (2d Cir.1978). The warden made this argument in its full form only in his appellate reply brief and in oral argument. The reference to *Tracy* appears to mean that the warden claims that the revocation procedure here was a redetermination of Brennan's basic eligibility for the program, rather than a revocation based on disciplinary grounds. This reevaluation, the warden claims, grew out of the reorganization of the prison administration in December, 1983, and the appointment of the new Commissioner of Corrections, Ronald Powell, and the new warden, Michael Cunningham. The warden contends that this reorganization brought with it the institution of new, more restrictive criteria for admission to the program. Brennan, the warden argues, does not qualify for the program under the new criteria.

It is instructive to compare this claim with *Tracy*. That case involved the return to custody, on the basis of an amendment

to the statute authorizing a work release program, of inmates already participating in the program. The amendment to the statute provided that inmates who were under sentence for certain violent crimes could only participate in the program with written approval of the commissioner, even if they were otherwise eligible. The court held that inmates already granted work release under the old criteria were entitled to a due process hearing under *Wolff* before they could be removed from the program. *See Tracy*, 572 F.2d at 396. The court also held, however, that prison authorities could revoke the inmates' work release status under the amended statute on the basis of facts already known at the time of their initial, preamendment determination of eligibility. The court thereby refused to prohibit "the State from changing its law regarding the eligibility of inmates already participating in the program." *Id.*

The central problem with making this argument in this case is that it was raised for the first time, at least in this form, in the warden's appellate reply brief. The district court made no factual finding concerning the nature of this claimed new policy on eligibility. Moreover, the new policy was not put in writing before the events at issue in this case took place. In *Tracy*, by contrast, the changed policy was embodied in a state statute which the court was able to evaluate and which could serve as a basis for judicial review of exercises of discretion under its authority. *See Tracy*, 572 F.2d at 397.

■ The only evidence in the record of the new policy here is a statement in an affidavit, dated May 29, 1986, of the new Commissioner of Corrections, Ronald Powell. Commissioner Powell states that he has, in making admission decisions,

> been particularly restrictive of inmates who are sentenced for crimes of extreme violence, crimes of sex, or child molestation. It is my practice to allow such inmates to participate in the halfway house program only after they have been assigned a definite parole date.

It would be difficult to use this affidavit as a basis for a judicial evaluation of the manner in which Brennan was removed from the program in early 1984. First, there have been no findings concerning the precise date of the new policy's implementation or concerning the meaning of clauses such as "particularly restrictive" and "definite parole date." The affidavit thus presents the beginning, not the end, of the inquiry. Would a "definite parole date," for example, exclude the exercise of parole board discretion at the final hearing? If not, the difference between a "definite" parole date and the kind of "assurances" given in this case is a matter of factual degree which should have been argued before the district court. *Cf. Jago v. Van Curen*, 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981) (rescission of parole board decision to grant parole not a violation of due process despite previous setting of a parole date). Perhaps more fundamentally, however, it is hard to see how a court, without supplementary findings, could conduct a due process evaluation of the implementation of a policy on the basis of a document written two years after the events in question. Thus, while the systematic redetermination procedure in *Tracy* may be appropriate in some circumstances, it is not properly before us here.

Furthermore, there is evidence that the decision to return Brennan to custody was not part of a systematic implementation of a new policy as was the case in *Tracy*. The warden has not attempted to show that a comprehensive review has been undertaken of the eligibility of all prisoners admitted under the old criteria. Rather, the action challenged here appears to have originated as a response to public attention and media coverage in this particular case. The newspaper articles calling attention to Brennan's participation in the program appeared in mid-January; Brennan was transferred on the thirtieth of that month. The note read to Brennan on that day explained his return to prison as stemming from "present community reaction to your parole." A memo written by N.E. Pishon, Assistant to the Commissioner of Corrections, also dated January 30, 1984, referred to "media releases" and "public clamor." Commissioner Powell's affidavit states that

the decision was made in part due to "the mounting media and victim attention."

The factor of public attention, Powell stated, was "combined with the lack of a definite parole date" to produce an "untenable situation for the inmate and the department." This "untenable situation" apparently derives from the unlikelihood, due to the public attention, that Brennan would be paroled at the end of his participation in the program; consequently, it is argued, he has an incentive to flee. *See, e.g.,* Affidavit of N.E. Pishon, Assistant to the Commissioner of Corrections.

The facts in this case, particularly the nature of the crime, are disturbing in the extreme and we sympathize with the response of the victim's family. Yet, even if a *Tracy* redetermination procedure were properly before us, we would agree with the district court that public pressure cannot be part of the legitimate considerations for decisionmaking in the kind of due process hearing at issue here. Public pressure can arise for many reasons, not all of which could be viewed as proper grounds for decisions under the fourteenth amendment. Where an inmate is entitled to due process guarantees, as here, the influence of public pressure on the decision must be viewed as improper.

## V. REMEDIES

The district court ordered the following relief: "Petitioner shall be returned to complete the work release program in Manchester, and upon successful completion thereof, a parole hearing shall be convened to hear petitioner's case." The appellant warden originally objected to the order concerning the parole hearing on the grounds that the parole board was not named as a party to the proceedings.[5] We agree with appellee, however, that, in a habeas corpus action, the petitioner must generally name the custodian who, in this case, is the warden. *See, e.g., Billiteri v. United States Board of Parole,* 541 F.2d 938 (2d Cir. 1976); *Britt v. McKenney,* 529 F.2d 44 (1st Cir.1976), *cert. denied,* 429 U.S. 854, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976).

The warden also claims that Brennan never requested any relief against the parole board. This claim is not quite correct. The original habeas corpus petition in state court requested, *inter alia,* "a parole hearing no less favorable than the hearing expected by Petitioner and the Respondents when Petitioner's work release was terminated." *See supra* at 3.[6] The habeas petition in district court requested "relief to which [Brennan] may be entitled including but not limited to an order reinstating [him] in the halfway house."

More difficult than these threshold matters, however, is the question of whether Brennan was substantively entitled to such relief. The district court, citing *Jago v. Van Curen,* 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981), specifically found that Brennan had no liberty interest deriving from the parole board's "assurances" given at the request of then Warden Perrin. The district court held that the "assurances" failed under *Jago*'s rejection of "mutually explicit understandings" as a basis for a liberty interest in a parole board's decision.[7]

There remains the possibility, however, that a parole board hearing at the completion of the halfway house program was one of the "liberties" of that program which were taken away from Brennan without due process in 1984. This claim would be

---

5. Appellant seems to withdraw this argument in his appellate reply brief.

6. This request also obviates any problems of exhaustion under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

7. This finding does not conflict with our holding, *supra* 454 U.S. at 16–18, 102 S.Ct. at 33–34, on the question of "what process was due." We found that the character of the work release program is such as to warrant a *Wolff* hearing when participation in the program is revoked. Our holding was based on a balancing test of various factors, as required by Court decisions such as *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872. These factors included the relationship of the program to the possibility of parole and the kind of change in the inmate's immediate situation worked by the revocation. That a liberty interest in *being paroled* does not exist here does not change the basic character and purpose of the program.

similar to the claim for *continuation* in the program; it would be different from a claim for an initial entitlement to *participation* in the program as well as from a claim of entitlement to a particular *decision* of the parole board. This claim would present a close question under *Greenholtz v. Nebraska,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1978), particularly under its distinction between a "liberty one has" and a "liberty that one desires," *id.* at 9, 99 S.Ct. at 2104.

We do not decide this question here, as it was not decided below and was not even fully presented before us. We will, therefore, reformulate the holding in this case; the district court's order, insofar as it may be construed as directly ordering the parole board to hold a hearing, should be modified.

■ We do, however, affirm the district court's reinstatement of Brennan in the halfway house until he completes the program. The question then becomes that of the meaning of the "completion" of the program. The warden argues that the halfway house program has no general "completion" period and that an inmate could theoretically remain in the halfway house for the duration of his sentence. In this case, however, having found a reasonable expectation on Brennan's part that he would continue in the program absent a violation of the regulations, we interpret "completion" in line with that reasonable expectation.

We find that, so long as he did not violate the rules of the program, Brennan could reasonably expect to remain in the program's "testing situation" for release until: (a) a parole board hearing is held (b) after he has participated in the program for as long as necessary to establish whether he is ready for release. We draw this holding from the various indications in the record concerning the purpose of the program in general and in Brennan's case in particular. *See supra* 442 U.S. at 7–8, 99 S.Ct. at 2103–04. In Brennan's case, this "testing" period for release is six months, as indicated by the parole board to Warden Perrin. *See supra* 442 U.S. at 2–3, 99 S.Ct.

at 2101–02. We stress that using the parole board's statement to Warden Perrin as evidence of how long it would be necessary for Brennan to remain in the program to fulfil its purpose as a "testing situation" is a different matter than looking to it as a source for a "liberty interest."

Under the parole board's recommendation, Brennan would have established whether or not he would be ready for parole in April, 1984, six months after his entry into the program at the end of October, 1983. This six-month period is consistent with other evidence, such as the Handbook and Commissioner Powell's affidavit, concerning the parameters of the time period generally required to "complete" the halfway house program.

On September 29, 1986, we denied appellant's motion for a stay pending appeal of the district court's reinstatement order. We assume that Brennan has been in the halfway house since that date. We now affirm the district court's order reinstating Brennan in the halfway house. As long as he does not violate the rules of the program, Brennan shall remain in the program from the time of his reinstatement for at least six months and, then, until a parole board hearing is held.

*Affirmed in part, Modified in part.*