**UNITED STATES of America, Plaintiff**

v.

**Lorenzo CATALAN–ROMAN, Hernaldo Medina–Villegas Defendants**

**No. CRIM. 02–117(PG).**

United States District Court, D. Puerto Rico.

Aug. 6, 2004.

Edwin O. Vazquez–Berrios, United States Attorney's Office, Torre Chardon, San Juan, PR, for Plaintiff or Petitioner.

Lorenzo Catalan–Roman, Gustavo A. Del–Toro–Bermudez, San Juan, PR, PHV Steven Potolsky, Steven M. Potolsky, PA, Miami, FL, for Defendant or Respondent.

Hernando Medina–Villegas, Donald R. West, Orlando, FL, Fletcher Peacock, Federal Public Defender, Middle District of Florida, Orlando, FL, Juan E. Alvarez–Cobian, Juan E. Alvarez Law Office, San Juan, PR, for Defendant or Respondent.

## OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

Pending before the Court is United States Magistrate Judge Aida M. Delgado–Colon's Report and Recommendation issued on June 30, 2004 (Docket No. 238) (hereinafter the "R & R") and the United States' Objections to the R & R (Docket No. 239). After reviewing the R & R, the objections, and the relevant case law, this Court finds that the government has not substantiated any legitimate government interest in Defendants' placement in administrative housing. Thus, as further discussed below, it is hereby **ORDERED** that

Defendants be removed from administrative housing and be reassigned to the general population.

## FACTUAL AND PROCEDURAL BACKGROUND

United States Magistrate Judge Aida M. Delgado–Colon's analysis of the background of this case is thorough and need not be repeated here. In brief, Defendants Lorenzo Catalan–Roman ("Catalan") and Hernando Medina–Villegas ("Medina") (collectively "Defendants") brought this action to contest their removal from the general population at the federal prison of MDC–Guaynabo and placement in more restrictive conditions in administrative segregation, commonly called "SHU." For the purposes of this opinion, this Court will **APPROVE AND ADOPT** the R & R and briefly address the objections raised by the United States.

## ANALYSIS

The United States objections to the R & R may be summarized as follows: First, the government objects to the Magistrate Judge's characterization of Defendants' motion as a habeas petition; thus, believes that this Court may not grant any form of relief to Defendants until after Defendants have exhausted all administrative remedies available to them. Second, the government argues that its concern about the potential disruption these Defendants pose to the general population gives sufficient cause to place Defendants in SHU. The R & R addresses these arguments at length, and this Court finds that the legal analysis of the R & R will not be disturbed.

The government's assertion that Defendants must first exhaust administrative remedies available to them is misplaced. This Court sits in its proper role as a judicial check on the constitutional limitations of the executive branch's, or in this case more specifically, the prison system's use of power. If an individual's protections, as bestowed by the constitution, are infringed upon by a government agency, the judiciary must intervene to protect these rights. Thus, it is clear to this Court that it has the authority to immediately act here, where Defendants, as pretrial detainees, are being subjected to unconstitutional treatment. Further, this Court is persuaded by United States Magistrate Judge Delgado–Colon's characterization of this matter as akin to a habeas corpus petition.

Next, the government assertion that it has a legitimate justification for the placement of Defendants in SHU has no support in the record of this case. The government has presented only one justification for placing the Defendants' into Administrative Housing: the potential that the Defendants', due to their status as death certified, pose a serious risk of disruption to the general population. However, Mr. Michael Smith, Chief Security Officer at MDC–Guaynabo, testified that his opinion that Defendants posed a risk was not based on any specific findings. In fact, he testified that after fourteen years of experience he could not think of a single incident which supported his opinion that being death certified resulted in a prisoner posing a risk to the general population. Also, Warden Ricardo E. Chavez's testimony made it clear that the decision to place Defendants in SHU was not based upon any discernable fact other than their status as death certified.

The failure of the government to demonstrate to this Court that placement of Defendants in SHU serves any legitimate Government interest mandates that this Court hereby **ORDER** that the Defendants be returned to the general population.

## CONCLUSION

Having **APPROVED AND ADOPTED** the R & R, which recommends that this Court exercise its authority and release Defendants from administrative detention because the government has not provided any legitimate basis for such detention, this Court orders that Defendants Catalan and Medina be returned to the general population.

**IT IS SO ORDERED.**

## *MAGISTRATE–JUDGE'S REPORT AND RECOMMENDATION*

DELGADO–COLON, United States Magistrate Judge.

Before the Court is Defendants' Urgent Motion for Evidentiary Hearing on Conditions of Capital Defendants' Confinement and Related Relief and the Government's Opposition thereto (Docket Nos. 161, 175, 219, 220).

### I. Factual and Procedural Background

#### A. In General

On April 3, 2002, the Grand Jury returned an indictment against defendants Lorenzo Catalán–Román (hereafter "Catalán") and Hernaldo Medina–Villegas (hereafter "Medina") and three other individuals charging counts of conspiracy, carjacking, violation of the Hobbs Act during the commission of two separate armed robberies, and the murder of a security guard during the commission of one of these robberies.

Thereafter on July 31, 2003, the Government filed its Notice of Intent to Seek a Sentence of Death (Docket No. 149) wherein the Government provided notice to Catalán and Medina of the fact that

[p]ursuant to the Attorney General's authorization dated July 31, 2003, and Title 18, U.S.C. § 3593(a) ... in the event of defendants' conviction on Count Eight of the Indictment ... (charging the) aiding and abetting in knowingly carrying and using firearms ... during and in relation to a crime of violence ... as set forth in Count Seven of the Indictment, ... and in the course of that crime, unlawfully killed Gilberto Rodriguez–Cabrera with malice aforethought through the use of a firearm, ... thus causing his death ... the government will seek the sentence of death....

*Id.*

Within the same motion the government provided notice to defendants of the threshold findings and aggravating factors the government intends to establish in accordance with 18 U.S.C. § 3591(a)(2)(A)(B)(C) and (D) and § 3592 (Docket No. 149 at pp. 3–4).

The record reflects that on November 5, 2003, the defense filed an "Urgent Motion for Evidentiary Hearing on the Conditions of Capital Defendants' Confinement" which was opposed by the government on December 4, 2003 (Docket Nos. 161, 175). The motions were referred for disposition on January 29, 2004[1] (Docket No. 202).

An evidentiary hearing was held on March 10, 2004. During the same the government appeared represented by AUSA Edwin Vázquez who presented the testimony of Michael Smith, Chief Segregation Review Officer (hereafter "Officer Smith"). The Warden at MDC–Guaynabo, Mr. Ricardo E. Chávez (hereafter "War-

---

1. In spite of the fact that defendants' motion pleads for an "urgent" hearing, due mainly to the defense attorneys' schedules and unavailability of lead counsels, the hearing at their request was rescheduled from February 4, 2004, to March 10, 2004. See Docket Entry Nos. 205, 206 (Defendant's Motion for Resetting Hearing for March 5–12, 2004), Docket Nos. 207, 210, 211 (Order Resetting for March 10, 2004).

den Chávez"), attended the hearing upon being summoned but was not called to testify by either party. The Court, however, made inquiry of Warden Chávez.

No witnesses were presented by the defendants. Nevertheless, an uncontested proffer was submitted by the defense. The evidence proffered was in regards to "the duties assigned or tasks being performed at MDC–Guaynabo by defendants Catalán and Medina while confined in general population" for over a year.[2]

### B. Defendants' Allegations

Defendants allege they were arrested on March 28, 2002, and since then have remained detained without bail. Upon their arrival at MDC–Guaynabo, both Catalán and Medina were assigned to the general population area, and their conduct at the institution was exemplary. Nonetheless, defendants argue, that once the Attorney General certified them and authorized the government to pursue the death penalty and solely because of this certification, the Bureau of Prisons, through the Warden at MDC–Guaynabo, removed them from general population and subjected the defendants to "more restrictive conditions in administrative segregation,"[3] commonly called "SHU."

The defense further asserts that "these conditions of confinement adversely impact defendants' right to counsel" under 18 U.S.C. § 3005 and the Sixth Amendment to the United States Constitution,[4] unfairly and unconstitutionally restricts the development of mitigating evidence in violation of the Eighth Amendment of the U.S. Constitution and denies them equal protection and constitutes cruel and unusual punishment when contrasted with the treatment of those pre-trial detainees who are still in general population (Docket No. 161).

The government opposes defendants' motion basically relying in the disposition under the Prison Litigation Reform Act which requires a prisoner to exhaust all administrative remedies that are available before submitting a civil action in federal court (42 U.S.C. § 1997e(a)), and the discretionary authority of the Warden to operate and place prisoners within a penal institution in light of his statutory responsibility to ensure safety measures within an institution. Finally, the government contends that none of the "deprivations" the defendants complain of (aside from religious and medical services) amount to violations of constitutional rights (Docket No. 175).

---

**2.** The government was granted five days in which to corroborate the information provided by defendants and submit any objections or clarifications to the same. The government submitted a supplemental response on March 18, 2004, in which the "position title" held by each defendant is corroborated, however, the duties entailed by each position are not described. To this extent, the defendants' proffer remains unrebutted (Docket No. 220).

**3.** These restrictive conditions include, as per defendants' arguments, limited telephone access (15 minutes once a week), cannot participate at commissary, lack of cooking facilities, inferior quality of mattresses, no privacy while showering, limited recreational opportunities (one hour every 24 hours at a holding

pen), no access to religious services, no access to television, highly secured escorts during visits and increased awaiting time prior to receiving visits, that is contingent to the availability of security personnel. It is undisputed that persons housed in SHU receive different treatment from those housed in general population.

**4.** This claim was withdrawn by defendants due to an agreement reached between counsel and the Warden allowing for implementation of procedures geared to expedite and facilitate defendants' access to and communication with counsel (letter dated November 18, 2003, submitted at the evidentiary hearing).

Following the March 10th hearing, the defendants and the government filed supplemental "post-hearing" briefs on March 17 and March 18, 2004, respectively (Docket Nos. 219, 220).

## II. Facts Elicited

Testimony was provided by Mr. Michael Smith, Chief Security Officer at MDC–Guaynabo, at the hearing held on March 10, 2004. He is the Chief Correctional Supervisor at MDC–Guaynabo and his job is to insure the safety and security of the institution and the orderly running and operation of the same. Docket No. 22, p. 19. Among his duties he supervises the Special Housing Unit (i.e., SHU). *Id.* The purpose of this unit is to segregate inmates from inmates in general population. *Id.* at p. 20. Officer Smith is also the segregation review official at the institution. *Id.* at p. 47.

Officer Smith explained that inmates are placed in the segregation unit to ensure the orderly operation or running of the institution and also upon an inmate's request to be placed there for security concerns or otherwise. *Id.* at p. 20. An inmate may be placed in segregation if there is a breach of an institutional administrative regulation, if the prisoner is involved in a fight or the prisoner makes an escape attempt. *Id.* Additionally, people who are convicted and sentenced on murder charges are placed in isolation. *Id.*

Placement in SHU is dependent upon the information received as to each particular inmate. *Id.* at p. 29. Prisoners are placed in SHU if the institution becomes aware of information it perceives or leads to believe that the inmate will disrupt the orderly running of the institution or the information leads it to believe that a person may harm the staff or do anything to jeopardize the security of the institution. *Id.* at 21. There is no difference in the treatment of pre-trial detainees from those individuals sentenced. *Id.* If the prisoner is perceived as a threat, the prisoner is placed in SHU. Id.

Officer Smith testified that the institutional policy regarding pretrial inmates is to identify certain indicators and that, if the inmate is perceived to be a threat in any way, shape or form—to himself, to others, to the security of the institution or to the orderly running of the institution, once the institution becomes aware of such information from its sources, be it the U.S. Attorney's office, the FBI, the DEA, other law enforcement officials or defense attorneys, then the inmate is placed in SHU. *Id.* at pp. 22, 28. In spite of this fact, Officer Smith clarified that these government agencies, however, do not run the institution by determining the place (area) or conditions of confinement. *Id.* at p. 28.

The institution's policies are determined by regulations and the regulations dictate that MDC–Guaynabo will solicit information from multiple sources and use that information in making a decision as to placement. *Id.* Once the information is provided and the administration at MDC–Guaynabo perceives there is a threat, then the decision is made. *Id.* at pp. 28–29. When such information is received, the internal directives indicate what information can be used to support the decision of having an inmate placed in SHU. *Id.* at p. 29.

According to Officer Smith the decision to place a person facing the death penalty in SHU is based upon criteria found in a program statement issued by the Bureau of Prisons. *Id.* at pp. 44, 54. In assessing an inmate's security requirements, the institution relies upon Program Statement 7331.04 and reviews criteria such as prior criminal history, record of violence, escape or attempted escape, current offense/charge, prior institutional adjust-

ment, age, behavior/attitude during intake screening, special needs, alcohol or drug abuse, detainer or other pending charges, bond information, group affiliations, notoriety, high profile cases in the media and potential length of sentence.

The length of sentence is a criteria Officer Smith personally considers justifies placement in SHU. *Id.* at p. 54. In Officer Smith's opinion, those exposed to life imprisonment qualify for such placement. However, when questioned on the issue, Officer Smith testified that he did not know that more than 50 percent of the general population at MDC–Guaynabo are technically facing minimum sentences of ten years up to life imprisonment. *Id. at p. 29.*

Officer Smith is unaware of any BOP policy regulation requiring that a person who is certified as death penalty eligible must be housed in SHU. *Id. at p. 53.* Nevertheless, he testified that it is standard operating procedure that once he becomes aware that an inmate is facing the death penalty he orders the inmates placement in SHU. *Id.* at p. 42. Indeed, Officer Smith testified that all inmates incarcerated at MDC–Guaynabo who are being certified as a death penalty defendant are placed in SHU based upon his determination. *Id.* at p. 57. Officer Smith testified that this is "automatic;" that it is standard operating procedure. *Id.* Actually, Officer Smith is vested with the authority to make such decision and was the one who determined that defendants Catalán and Medina had to be transferred from general population to SHU once death penalty certified. Such a determination by Officer Smith may be appealed to the Warden.

On cross examination Officer Smith also testified that in deciding placement the inmate's profile is reviewed and that the offense charged is a criteria also used to decide whether to place the defendant in general population or SHU. *Id.* at p. 59. He further testified that the inmate does not have to be a death penalty inmate to be placed in SHU and that if the inmate has done something "really bad" it is taken into consideration. *Id.*

Officer Smith admitted there are numerous differences between being housed in general population and in SHU. *Id.* at pp. 29–35. For example, when housed in SHU, work programs are unavailable and inmates cannot leave the unit to attend educational classes. *Id.* at p. 49. However, educational items can be brought to the inmate. *Id.* at p. 50.

The total capacity of SHU is for approximately 70 people and at the time of the hearing 60 people were housed there. *Id.* at p. 25. Although specifically questioned, Officer Smith was unable to provide information on how many of those 60 individuals were confined for violations of the rules of MDC–Guaynabo or how many were place in solitary confinement at the request of the U.S. Attorney's Office. *Id.* at pp. 25–26. Officer Smith recalled, however, that since he has been at MDC–Guaynabo at least one person has been placed in SHU at the request of the defense attorney. *Id.* at p. 27. He also considered that numerous defendants request to be placed in SHU. *Id.*

In regards to the above-named defendants, the evidence on record shows that defendant Medina arrived at MDC–Guaynabo on April 2, 2002. According to the government. Medina has not had any disciplinary incidents since his arrival at the institution. Medina worked as a cook for the food service department from August 12, 2002 through November 6, 2002, and from January 3, 2003 to January 5, 2003. From January 5, 2003 until January 30, 2003, he worked as a food service orderly, and from April 10, 2003 to July 31, 2003,

he worked as the unit orderly assigned to clean the unit windows.

Medina proffered that he worked at the kitchen and later he moved to an area where he cleaned the floors. Docket No. 222, p. 70. In the kitchen he was a cook, preparing foods and in that capacity he had access to and used knives. *Id.* at p. 71. He also took some English courses, a course in physical education and a book binding course. *Id.* at p. 70. In the book binding course he also used knives. *Id.* at p. 71.

The government proffered that on June 15, 2003, Medina was placed under administrative detention (i.e., SHU). The Administrative Detention Order indicated that he was placed in administrative detention for security reasons as he was facing the death penalty. Medina was also advised that he was placed in administrative detention to prevent any incident within the institution and to maintain the security and orderly running of the same.

Officer Smith admitted that Medina was held in general population at MDC–Guaynabo from April 2002 until June 2003, without any violations of MDC–Guaynabo regulations. *Id.* at p. 52. Medina was placed in SHU in June 2003, time by which Officer Smith was informed that Medina was going to be certified as a death penalty defendant, information he believes to have received from the institution's legal department. *Id.* Officer Smith personally made the decision to place Medina in SHU. *Id.* at p. 53.

Co-defendant Catalán arrived at MDC–Guaynabo on approximately April 29, 2002,[5] and upon his arrival he was also placed in general population. Since his arrival he had one disciplinary incident, on February 3, 2003, for failing to follow safety regulations. *Id.* at p. 37. He was given a suspended sanction of loss of 30 days of visiting privileges pending 30 days of clear conduct. Institutional records do reflect that from April 4, 2003 to April 9, 2003, Catalán worked as an orderly in his housing unit cleaning windows. From July 1, 2003, through September 22, 2003, he worked as an orderly in his housing unit cleaning the upper tier of the unit.

Catalán proffered that while in general population he had taken guitar lessons and that prior to his placement in SHU he was going to begin a book binding class. *Id.* at p. 71. He worked as a night orderly providing maintenance services (cleaning) and in such capacity he had access to brooms, mops and cleaning detergents. *Id.*

During the hearing the government stipulated that Catalán lived for more than a year in general housing and remained there until he was "death certified" on July 31, 2003. *Id.* at pp. 35–36. The government proffered that Catalán was placed on administrative segregation on August 29, 2003. The MDC–Guaynabo administration based Catalan's re-assignment to SHU on the same grounds or reasons proffered for Medina's placement at SHU: he had been certified and was now exposed to the death penalty.

According to prison records, Catalán did not request placement in SHU. *Id.* at p. 40. Officer Smith testified that Catalán was placed in SHU after MDC–Guaynabo received information concerning the length or type of sentence he could potentially receive. *Id.* at p. 41. Officer Smith did

---

**5.** The government's response indicates that Catalán arrived at MDC–Guaynabo on April 29, 2003. The year 2003 appears to be a typographical error. Also, the Court Docket indicates that Catalán was arrested on March 28, 2002, and his initial appearance was held on April 2, 2002 (Docket No. 7). At that time Catalán was being held at a hospital facility. *Id.*

not recall when the information was received, but if he were to "take a guess" it was the same day of his placement in SHU. *Id.* at pp. 41–42. Officer Smith had no other additional information regarding Catalán, his character, or any other data indicating Catalán posed a potential threat to the institution, its personnel or any other inmate. *Id.* According to Officer Smith, when placing an inmate in SHU, the decision is totally based on security reasons and when Officer Smith becomes aware of the inmate's possible maximum sentence. *Id.* at p. 43. For Officer Smith it is standard operating procedure that all inmates facing the death penalty must be and are placed in SHU. Officer Smith was responsible for having made the decision to place Catalán in SHU. *Id.* at pp. 43, 47. It is clearly gathered that Officer Smith's sole criteria considered for placing Catalán in SHU was the length of the sentence he was exposed to. *Id.* at pp. 46–47.

Nonetheless, Officer Smith argued that Catalán was placed in SHU for security reasons. *Id.* at p. 60. Evidence on record shows that Catalán received a copy of the notice of placement in SHU on August 29, 2003. *Id.* at p. 60. It stated, "as you are aware, you are facing the death penalty for your crimes. Your placement is to prevent any incident in the institution and maintain the security and ordinary running of the institution." *Id.* at p. 60. Medina received notice of placement in SHU on June 15, 2003. *Id.* at p. 62. The reasons for Medina's placement in SHU are the same as for Catalán. *Id.*

Under the assumption that Catalán would be housed in SHU because of his sentence exposure, Officer Smith was asked whether it was reasonable or made any sense in proceeding with an adminis-

trative remedy, like an appeal, and he replied "I think that all inmates should use the administrative remedy procedure." *Id.* at p. 46.

Officer Smith, who is the segregation review official, testified that part of his duties include a 30–day review of the files on inmates housed in SHU. *Id.* at p. 47. This review process includes reviewing the file of death certified inmates. *Id.* at p. 48. When asked whether upon concluding his review of a death certified inmate's file could that inmate return to general population if he showed that he was not a threat to himself, other inmates or the institution, Officer Smith answered, "No". *Id.* at p. 48. He further testified that "no matter what," the death penalty certified inmate is going to stay in SHU. *Id.* Defendant Catalán has requested, at the institutional level, to be removed from SHU. Officer has denied such request indicating he rather "wait until Judge Pérez–Glménez decides." *Id.* at p. 63.

Officer Smith testified that he reviewed the records for Catalán and Medina every 30 days, as per regulations, and after each of the reviews he determined that they should remain in SHU.[6] *Id.* at p. 55. If not in agreement, Officer Smith argues, both inmates could have appealed his decision. *Id.* at pp. 55–57.

Officer Smith opined that an inmate who is exposed to the death penalty is a risk or threat to the security of the institution. *Id.* at p. 52. He based this opinion on his 14 years experience with the Bureau of Prisons. Officer Smith considers that an inmate facing the death penalty is more prone to disrupt the orderly running of the institution if allowed to in general population. *Id.* at p. 64. Based upon his experi-

---

6. There is no evidence on record indicating that during such evaluations Officer Smith went through or evaluated the criteria enunci-

ated in 28 C.F.R. § 541.22 or Program Statement 7331.04.

ence, it is his opinion that these types of inmates become more desperate and are more likely to take a hostage, hurt a staff member, or hurt another inmate. *Id.* However, in cross-examination he admitted that no such incident has ever taken place at MDC–Guaynabo.

Throughout his career within the Bureau of Prisons, Officer Smith has worked at four correctional institutions. *Id.* at p. 64. He testified that it has been a standard operating procedure at all penal institutions where he was the Captain to remand those facing harsh sentences. *Id.* He further testified that in talking to other captains in the region he is following the same standard applied to death penalty inmates (*Id.* at p. 64) which is carried out to prevent hostage taking. Nonetheless, Officer Smith acknowledged that he has never faced a hostage taking because his experience has been at medium level security institutions and that type of inmate would not come to the institutions where he had worked. *Id.* at p. 65.

Officer Smith testified that aside from the information regarding penalty exposure of the defendants, he did not receive any other information from the government that would cause him to place the defendants in SHU. *Id.* at p. 44.

The Court made inquiry of Warden Chávez. *Id.* at p. 73. He corroborated the fact that when the institution is placed on notice that a defendant is "death certified" that information is used to assess security needs. *Id.* at p. 74. The Warden further explained that there are security precautions or measures to be taken in regards to inmates based upon the information received, the nature of the charge, the current charge, as well as the potential sentence. *Id.* The Warden concurred with Officer Smith and corroborated that the sole criteria that an inmate is death penalty certified triggers the institutional practice implemented at MDC–Guaynabo where the inmate is placed in or reassigned to SHU. *Id.* When questioned whether a person charged with a capital crime and/or exposed to a death sentence, being this the only factor considered, warranted housing in SHU, Warden Chávez answered in the affirmative. To this extent Warden Chávez concurred with the opinion and decision making process implemented by Officer Smith.

## III. Analysis

In their initial motion defendants sought relief from the Court on the unreasonable restriction of attorney/client "free access," the unjustified restriction of the opportunity to develop mitigating evidence, the unreasonable denial of equal treatment *vis a vis* other pre-trial detainees, and the denial of proper medical care to Catalán. In filing their post-hearing brief, defendants advised the court that the access to counsel issue appears to have been satisfactorily resolved and that a temporary compromise was reached *vis a vis* medical care, leaving unresolved only the issue of unreasonable interference with defendants' ability to defend against the death penalty (i.e., develop mitigating evidence). Defendants contend that their removal from general population into administrative detention, absent any misconduct on their part, is arbitrary, capricious and unfair.

### A. Exhaustion

█ The undersigned turns first to the issue of exhaustion. The government is adamant that the defendants are required to exhaust their administrative remedies pursuant to the Prison Litigation Reform Act (hereafter "PLRA"), 42 U.S.C. § 1197e(a), and because they did not this court lacks subject matter jurisdiction. Exhaustion, however is a waivable affirmative defense, not a jurisdictional require-

ment. *See Casanova v. Dubois,* 304 F.3d 75, 78 n. 3 (1st Cir.2002).

The PLRA statute provides that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted". 42 U.S.C. § 1997e(a). Indeed, the U.S. Supreme Court has held that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Porter v. Nussle,* 534 U.S. 516, 531, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). More so, the PLRA requirement has no "futility" exception. *Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

■ The government's position, however, overlooks a crucial fact in this matter. This is not a separate action or civil suit brought by the defendants. Defendants filed their motion in the pending criminal action based upon their status as "death certified" defendants; they did not file an action or suit. Consequently the PLRA is inapplicable to the matter at hand. *See e.g. Monahan v. United States,* 276 F.Supp.2d 196, 204 n. 6 (D.Mass.2003)

Further, the motion filed by defendants is more in line with a habeas corpus proceeding challenging the fact of confinement. See 18 U.S.C. §§ 3626(g)(2). While at first blush it appears that defendants challenge their prison conditions, after the hearing in this matter it became clear that they challenge their placement in administrative segregation on the sole criteria that they are "death certified," inasmuch as same implicates the Eighth Amendment and the defendants' ability to develop mitigating evidence in defending against a possible death sentence.

Ordinarily, "the writ of habeas corpus is used to completely free an inmate from unlawful custody." *Falcón v. United States Bureau of Prisons,* 52 F.3d 137, 138 (7th Cir.1995) (citing *Preiser v. Rodríguez,* 411 U.S. 475, 484–85, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). Courts have also, in certain circumstances, extended the writ to include claims by which a prisoner seeks, not earlier or immediate freedom, but a less restrictive form of custody. *See, e.g., Maleng v. Cook,* 490 U.S. 488, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (Claims of entitlement to probation, bond, or parole are properly brought via habeas corpus). More so, it is well established that challenges to the "manner, location, or conditions of a sentence's execution" are proper subjects of a habeas corpus action under §§ 2241. *González v. United States,* 150 F.Supp.2d 236, 240 (D.Mass.2001) (citing *Hernández v. Campbell,* 204 F.3d 861, 864 (9th Cir.2000)).

In this regard, the First Circuit has stated in dicta that certain kinds of conditions of confinement actions can be brought as habeas petitions. In *Brennan v. Cunningham,* 813 F.2d 1 (1st Cir.1987), the court held that a prisoner's claim for reinstatement in a work release program could proceed as a habeas petition. *Id.* at 4–5. The court's holding rests primarily on the way in which the reinstatement claim resembled a challenge to the fact or duration of incarceration. The Court noted that the question was open as a matter of Supreme Court precedent and that, in the First Circuit, at least some conditions of confinement claims could be brought as habeas corpus petitions, subject to obvious limitations (for example, release from incarceration would rarely be an available form of relief in such habeas actions). *Id.*

at 4–5; *Kane v. Winn,* 319 F.Supp.2d. 162 (D.Mass.2004).

Accordingly, it appears the appropriate vehicle for seeking a transfer from administrative detention to general population is a habeas corpus petition. In the present case the defendants filed a motion rather than a habeas corpus petition. The undersigned, however, determines to treat said motion as a habeas corpus petition pursuant to § 2241.[7] *See United States v. Felipe,* 1996 WL 409181 (S.D.N.Y. July 19, 1996) (Court converts motion seeking release from administrative detention filed by pretrial detainee into habeas corpus petition).

The government argues, the issue of exhaustion still remains an issue. However, the statutory PLRA exhaustion requirement does not apply to § 2241 proceedings. *See Davis v. Fechtel,* 150 F.3d 486, 490 (5th Cir.1998) ("The PLRA thus does not apply to section 2241 proceedings."); *United States v. West,* 2003 WL 1119990, at *2 (E.D.Mich. Feb.20, 2003) ("[T]he explicit exhaustion requirements which are contained in ... the ... AEDPA ... and the ... PLRA do not apply to habeas petitions filed under 28 U.S.C. §§ 2241."). Section 2241 does not expressly require exhaustion of remedies. Nevertheless, generally when an inmate is dissatisfied with a determination made by the Bureau of Prisons the matter is resolved through an administrative process and then through judicial review. *See Rogers v. United States,* 180 F.3d 349, 357–58 (1st Cir.1999)

In this matter, however, the undersigned finds that pursuit of administrative remedies in this matter would be futile.[8] The undersigned bases said determination upon the testimony elicited at the hearings, wherein both Officer Smith and Warden Chávez testified that the standard operating procedure is to automatically place a defendant in SHU or administrative detention upon that defendant being death penalty certified. More so, based upon Officer Smith's testimony it appears that this is the "unwritten rule" or standard applied to death penalty inmates housed at MDC–Guaynabo. *Id.* at p. 64. See *Monahan v. United States,* 276 F.Supp.2d 196 (D.Mass.2003); *Iacaboni v. United States,* 251 F.Supp.2d 1015, 1017 n. 1 (D.Mass. 2003). The obvious futility of any administrative remedy would excuse the failure to exhaust. *See, e.g., Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994) (exception to exhaustion requirement for §§ 2241 claim applies when attempt to exhaust would be patently futile); *Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 774 (1st Cir.1981) (exhaustion not required when the issue is a "pure matter of law").

Based upon futility, there is no imposition of the exhaustion requirement and the undersigned turns to the merits of this matter.

---

**7.** This may not be necessary inasmuch as research into the matter revealed that rulings can be made in motions for transfer out of segregation filed in pending criminal cases, with no finding of a requirement that the matter be considered as a § 2241 petition. *See e.g. United States v. Gotti,* 755 F.Supp. 1159 (E.D.N.Y.1991). Further conversion may not be required inasmuch as the issue raised implicates the defendants' Eighth Amendment right that a death sentence not be imposed arbitrarily. *See Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144

L.Ed.2d 370 (1999). Finally, the motion may fall under the ambit of 18 U.S.C. § 3142(j) inasmuch as the detention in administrative segregation may be construed as modifying or limiting the presumption of innocence.

**8.** This issue of futility under § 2241 is not to be confused with futility under the PLRA. As noted above, under the PLRA there is no futility exception. *See Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

## B. Discretionary Authority to Operate MDC–Guaynabo

The government's position is that the defendants' placement in administrative detention directly implicates the Bureau of Prisons' ability to control and manage MDC–Guaynabo. Further the government argues that the situation at bar falls within the scope of activities delegated to the Attorney General and the Bureau of Prisons pursuant to 18 U.S.C. § 4001 and 18 U.S.C. § 4042. Finally, the government notes that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests.

In the present case the defendants were placed in administrative segregation "because they are facing the death penalty" for the crimes of which they are accused and "to prevent any incident within the institution and to maintain the security and orderly running of the institution." Docket No. 175, p. 15.

 It is a clearly settled principle that the government can lawfully incarcerate persons awaiting trial on criminal charges but cannot punish them. *Bell v. Wolfish,* 441 U.S. 520, 534–35, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However the imposition of punishment is not constitutionally permissible as a reason for placing or keeping a pretrial detainee in administrative segregation and "a particular condition or restriction of pretrial detention [should be] reasonably related to a legitimate governmental objective." *Id.* at 538–39. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. *Id.* at 639 (citations omitted).

The government contends that the defendants' placement in administrative detention does not imply misconduct or a breach of a prison regulation. It relies upon 28 C.F.R. § 541.22 to support its position that administrative detention is non-punitive in nature. Section 541.22 provides in pertinent part that

Administrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population.

(a) Placement in Administrative Detention. The Warden may delegate authority to place an inmate in administrative detention to Lieutenants. Prior to the inmate's placement in administrative detention, the Lieutenant is to review the available information and determine whether the inmate's placement in administrative detention is warranted. The Warden may place an inmate in administrative detention when the inmate is in holdover status (i.e., en route to a designated institution) during transfer, or is a new commitment pending classification. The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate:

(1) Is pending a hearing for a violation of Bureau regulations;

(2) Is pending an investigation of a violation of Bureau regulations;

(3) Is pending investigation or trial for a criminal act;

(4) Is pending transfer;

(5) Requests admission to administrative detention for the inmate's own

protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection (see §§ 541.23); or

(6) Is terminating confinement in disciplinary segregation and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.

29 C.F.R. § 541.22.

■ It is the government's position that administrative detention is reasonably related to the governmental objective to preserve the safety, internal order and security within the institution. Here, the government's reason for placing the defendants in administrative detention, is their status as "death certified." Other than the fact of their possible sentence, there is no serious contention that the defendants pose a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution. Hence, it is difficult to determine just what "legitimate governmental objective" continued administrative detention would serve. This despite the government's wholesale argument that a legitimate objective for holding a pretrial inmate in administrative detention is the preservation of safety, internal order and security within the institution. This position totally disregards the unrebutted and undeniable fact that both defendants resided in the general population without incident for over one year prior to being "death certified."

More so, there is nothing in the record to support the prison officials' belief that the defendants should be kept in adminis-

trative detention for the aforestated reason. Quite simply, there is absolutely no suggestion of a reason for such belief, other than the fact that the government seeks the death penalty. The testimony provided by Officer Smith is that based upon his experience [9] defendants certified eligible for the death penalty are more prone to dispute the orderly running of the institution if they remain in general population, are more desperate and are more likely to take a hostage, hurt a staff member or hurt another inmate. In Officer Smith's opinion, placing an inmate in SHU is a way of preventing hostage taking; nonetheless, he has never faced such a situation at MDC–Guaynabo or elsewhere. Based upon the testimony presented, it is clear that the restriction imposed upon the defendants is exaggerated and "excessive in relation to the alternate purpose assigned to it." *Bell v. Wolfish*, at 538, 99 S.Ct. 1861; *See United States v. Gotti*, 755 F.Supp. 1159 (E.D.N.Y.1991) (fact that pretrial detainees were charged with multiple murders, conspiracy and solicitation to murder, and obstruction of justice, including witness tampering, did not justify their placement in administrative detention, in absence of evidence that since detainees had been in custody they committed an act or omission which posed a serious threat to inmates or to security of institution); *United States v. Suleiman*, No. 96 CR 933 WK, 1997 WL 220308 (S.D.N.Y. April 1, 1997) (no justification for placing World Trade Center bombing defendant in administrative detention on the basis of alleged perjury during grand jury proceedings and associated with individual convicted for role in World Trade Center bombing).

9. This "experience" appears to be questionable, inasmuch as Officer Smith admitted that in past work experience he had never dealt with maximum security inmates. Rather than based on his experience, Officer Smith's statement appears to be grounded on a personal opinion which basis was not concretely uttered.

Accordingly, the undersigned finds that defendants Catalán and Medina's detention in SHU is punitive and not regulatory.

### C. Eighth Amendment Claim

There is another concern that must be addressed. These defendants are facing the possibility of a death sentence; the harshest of punishments. The Supreme Court is quite clear in its pronouncement that the Eighth Amendment requires that a sentence of death not be imposed arbitrarily. *Jones v. United States*, 527 U.S. 373, 381, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Placing the defendants in administrative detention raises the specter of the preclusion of the presentation of mitigating evidence at sentencing if these defendants are found guilty. This is so because in order to satisfy the requirement that sentencing decisions rest upon an individualized inquiry, "broad inquiry" must be allowed into all "constitutionally relevant mitigating evidence." *Id.*

In this particular case, without having incurred in disciplinary violations, both defendants have been precluded from participating in educational and work programs. More so, they are precluded from gathering and presenting evidence on their rehabilitative efforts, ability to adjust to life in general population and, as such, present mitigating evidence.

Under the federal death penalty statute, a defendant has the right to present mitigating evidence pertaining to "the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence." 18 U.S.C.A. § 3592(a); *cf. Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (the sentencing court must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the of-fense that the defendant proffers as a basis for a sentence less than death").

Additionally, in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the court held that a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is by itself an aspect of his character that is by its nature relevant to the sentencing determination." *Id.* at 7, 106 S.Ct. 1669. *Skipper* provides that any evidence that tends to shed light on the defendant's character is relevant mitigating evidence and the defendant must be allowed to present it to the jury. *See id.* at 8, 106 S.Ct. 1669. More so, in *Simmons v. South Carolina*, 512 U.S. 154, 163–64, 168–69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Supreme Court concluded that relevant penalty stage evidence included evidence that the defendant would be ineligible for parole if given a life sentence, once the government put at issue the defendant's future dangerousness. These cases take stand for the proposition that proffered evidence is relevant to death penalty sentencing if (1) it is probative of an enumerated mitigating factor, especially some aspect of the defendant's character, or (2) it is offered in rebuttal to an evidentiary showing made by the prosecution in support of conviction or an aggravating factor. Additionally, in *O'Dell v. Netherland*, 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), the Supreme Court examined *Simmons* and reiterated the *Simmons* rule that the prosecution's showing of a defendant's future dangerousness gives rise to a due process right to "deny or explain" that showing.

The wholesale determination that, once a person is "death certified," that person must be held in administrative detention, removed from the general population wherein he exhibited positive adjustments and exemplary behavior, effectively elimi-

nates the ability of the defendants to establish mitigating evidence relative to their character and adjustment to life in prison. Indeed, the failure to develop said evidence may lead to the conclusion that, because defendants were continuously held in administrative detention, same equals "future dangerousness," thus denying defendants the due process right to "deny or explain" that showing.

For the above stated reasons, the Court cannot countenance this type of interference in a capital case when said interference implicates the defendants' Eighth Amendment right to present relevant mitigating evidence. The certification as a death penalty defendant warrants more than an automatic determination that such a defendant must be housed in administrative segregation. In this particular case defendants Catalán and Medina's placement in segregation is not warranted even under 29 C.F.R. § 541.22; statutory provision which institutional authorities here have ignored.

## IV. Conclusion

After careful review of the facts and the law, the undersigned finds no legitimate governmental objective that could be served by continuing Catalán and Medina's administrative detention. The undersigned further finds that continued detention implicates or jeopardizes Catalán's and Medina's Eighth Amendment Right that a sentence of death not be arbitrarily imposed. Accordingly, it is RECOMMENDED that defendants Catalán and Medina be forthwith released from administrative detention and transferred once again to general population.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72(a) and Local Criminal Rule 157.1. Any objections to the same must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Local Rule Civ. Rule 72(d); Fed.R.Civ.P. 72(b). Failure to timely file specific objections to the Report and Recommendation waives the right to review by the District Court, and waives the right to appeal the District Court's order. *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980). The parties are advised that review of a Magistrate–Judge's Report and Recommendation by a District judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate–Judge. *Paterson–Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir.1988).

SO RECOMMENDED.

July 1, 2004.